respectively, for our argument not to exceed 10 minutes for each defendant, 30 minutes for the plaintiff. These 14 defendants, 5-1-2, will be submitted on the brace. Good morning, Your Honor. Some logistical things here to start off with. I'm going to use 10 minutes of my time here. And Ms. Moore on behalf of Ms. Kincaid will use 10 minutes and Mr. Gulley will use 5 minutes. We've saved collectively 5 minutes for rebuttal, which may be one or all of us. It just depends on how things are this morning. So that's our logistics. So if it pleases the Court, Your Honors, my name is Mark Brown. I represent the defendant in this case, Dustin Morgan. On behalf of Mr. Morgan, we would like to thank you for the opportunity to be here today to present this argument and present our case for reversal from the United States District Court for the Eastern District of Tennessee. I'll be addressing briefly some issues in my amount of time that go specifically with Mr. Morgan. And then I probably will also touch on the drug quantity issue, which goes to all of us. But there may be additional arguments that Mr. Gulley and Ms. Moore bring up with that as well. With respect to Mr. Morgan, we put several issues out there. But one of the big issues that we have on his behalf is that the evidence in this case was insufficient to convict him of drug conspiracy and firearms charges within the Eastern District of Tennessee. This is the ultimate case, with respect to Mr. Morgan, of guilt by association. There is no dispute the Breakthrough Pain Therapy Center was owned by his stepfather, Randy Kincaid, and his mother, Sandy Kincaid. But they were the owners of this clinic. The evidence at trial showed they set it up as a Tennessee limited liability company. They had the right and were the only signatories on the accounts that were set up for the business. The records that were introduced at trial, the bank records from Green Bank and other banks, show specifically that my client, Mr. Morgan, was a compensated employee of $500 per week at the start, eventually rising to $600 per week. Wasn't he there with a firearm as acting as, in a sense, a security guard? Initially, yes, Your Honor. And it was, in all candor, yes, a firearm that was found on the day of the raid on December 14, 2010 that was found in his desk. And he initially did work as a security guard at the clinic. Eventually, though, he transitioned into other duties, which was just generally office duties. Those don't help your case too much, though, collecting cash from all these folks that are in there waiting for their pills, frankly. Well, Your Honor, that is a... That doesn't sort of raise a question in one's mind. Hmm, it's interesting. What's going on here? Well, there's no more difficulty with collecting cash, and that being your specific job function, than what every other person at that clinic was doing as a job function. There were other job functions that were being done there, front desk duties, et cetera, et cetera. How were all of them involved in the conspiracy? I guess I can't speak for the United States government on that, Your Honor, and I don't know. That's what I've been trying to think about for about five years now. I mean, the doctor in particular, but anyway. Yeah, and the doctors is a critical issue, as far as I'm concerned, Your Honor. You make a very good point. The government doesn't have to indict everyone in the same indictment. No, they do not. That's true. They don't. But in this point, until much later, they didn't even get at the doctors. Initially, it was just the owners of the clinic, Ms. Henry, who was working there for a while, who's Ms. Kincaid's daughter, and my client, Mr. Morgan. So those were the people that they indicted initially. And actually, Mr. Morgan, my client wasn't indicted initially in 2010. It was only until the superseding indictment like a year later. I'd never even heard of this case. I think I heard about the raid on the clinic on the news in 2010, but I had no involvement with this case until the superseding indictment was issued in 2011. So he was not initially part of the case. In fact, on the day of the raid, he was working there. And, of course, they had their search warrants and looked for whatever evidence they could find. They found the gun in his desk that day, and he didn't get indicted until almost a year later. And, in fact, my client was Mr. Morgan's, you know, freely cooperated with the agents that day and let them go to his house. All these things are consistent with somebody also participating in a conspiracy. Well, they would be consistent with someone participating in a conspiracy if they knew specifically what this clinic was about. I guess that's where I'm having a hard time. I would think that any sentient individual who is in the midst of all this day after day knows what's going on. I mean, that's just the reality, you know. And I guess this is your chance to explain why it wouldn't have been obvious. Well, even considering that it's open and obvious, okay, even if it looks, I believe the case law says, you've got to be something a little more than an environment that reeks of something afoul. And, candidly, Your Honor, yes, you can probably look at what's going on in this clinic and think, yeah, maybe there's a little, you know, something shaky going on here, you know, maybe, or whatever. But in his position at that clinic, you know, even though he's related to mother and stepfather who own the clinic, he's not the owner of the clinic. But he doesn't have to be. I mean, you don't have to be the owner of the clinic to be in the conspiracy. I mean, it's not a title issue or something. No, and I agree with you there, Your Honor. And I'm not asking this court to sit here and say, as a blanket matter of policy, just simply because you're employed somewhere doesn't mean that you are, you know, that you're... Why can't we infer, I mean, that he agreed to participate in this pill mill venture? I don't think we can agree. And I see we're stacking inference upon top of inference upon top of inference. And we say, well, you know, I guess the part I'm having trouble with is how do we get that he's involved in it other than the fact that he's associated with these people. I mean... Carrying a gun walking around the building, I mean, that's a helpful thing for somebody who's in the midst of an illegal cash business. And he's also, though, that was his job initially. And, again, Your Honor, I know I'm, I guess we're sort of bouncing back and forth and arguing here. But, you know, the day of the raid, the gun was actually in his desk. He was doing his job functions, the other job functions that particular day. He was not doing, not carrying a gun on his hip working as a security guard. One thing that's very damaging, it seems, for your client is that one witness said that she saw Sandra give a green pill to Dustin, and the witness thought it was oxycodone. You know, that's pretty damaging, isn't it? Well, it would be, except for the fact that that particular witness, and I understand we're talking about credibility issues. I get that. I mean, you know how we have to look at the records. I do. I know. And it's construed in the light most favorable to the prosecution. I know that's a high hurdle that I have to jump over, and I'm kind of used to that in my line of work. So, you know, it's hard to jump over those high hurdles. But, you know, that particular witness didn't know for sure. I think it's clear from the record that that was an oxycontin pill. He didn't, he showed up at the trial having taken morphine that morning. Again, I understand we're talking about credibility issues, but you look at that through the prism of that particular statement, and I think, you know, he thought it was an oxycontin pill, but he's not really sure, and he's a drug dealer who's, you know, out on the streets every day, who would be familiar with drugs, except this guy's only source of income, he said, was digging ginseng in the mountains, which I think is kind of what happens a lot in East Tennessee. So, but I don't consider, and I see what you're saying, Your Honor, but I don't consider that to be as significant as it would appear because of the simple fact that the witness couldn't specifically say, you know, what it was. Was it for him to take? Is that, I mean, we're talking about one pill. We're talking about one pill, yes. So, Sandra, his mother, could have given it to him because he was in pain and he could have taken it? That wouldn't be part of a conspiracy. No, it wouldn't. No, it would not. I mean, it would just simply be a, that's more of a kind of a hand-to-hand transaction than it would be a conspiratorial thing, so yes. Could you, do you, I know your time is short. Sure. Are there any other issues that you wanted to talk about other than sufficiency? Just briefly on the drug quantity issue, if I can, and we've all pled, we've all stated in our briefs that we think the calculations were fundamentally flawed because of the average customer, and the problem with the average customer at the Breakthrough Pain Therapy Center is there was a total sample, at the time of the sentence hearings, of 52 files. There were 54 additional later, so you've got 106 total files out of 12,260, I think I wrote down, which is a very small percentage of what happened, and the inference we have to jump through there is that we have to go, we have to say, well, every person who came into this clinic was prescribed illegal narcotics, and that's just simply something that we do not know. You can make an inference on that, but we don't know that that was specifically the case. So the average customer, which gets Roxycodone, 120 Roxycodone, 30 milligram pills, you multiply that by the number of visits, 14,131. My co-counsel was impressed I remembered that number last night, but I've read it enough this week that I know that. And then you get your average customer, and you get your drug quantity calculations that way. The problem with the average customer, as I said, is that small sample of files. The bigger problem is that assumption that everyone there got illegal narcotics. And the other problem is, even on the initial 52 files, there were only several of them, I believe, 11 or so, that were dismissed as patients. We have to sort of throw them out at that point. So we submit, and they may have more to say about this, the methodology was flawed, and all things considered, these cases need to be reversed. Let me ask you just one technical point, and super quickly. Didn't this methodology yield a marijuana equivalence that was itself 11 times the amount necessary to reach the base offense level of 38 that he was sentenced under? Yeah, candidly, Your Honor, I think it came out to about 340,839.72 kilograms of marijuana equivalency, which is a very, very, very high number. There's some play in the joints here, right? I mean, no pun intended. I better leave that one alone. Again, Your Honors, I would like to thank you for the opportunity to be here today. I don't know that I'll get to step back up here and talk to you again, but thank you for the opportunity. Thank you. Who's next? Good morning. May it please the Court, my name is Andrea Moore, and I represent the appellant Sandra Kincaid. Sandra Kincaid is appealing her convictions on three counts of the superseding indictment. She was convicted in count one, the conspiracy to distribute count, count four, which alleged aiding and abetting her husband, Randy Kincaid, and the possession with intent to distribute oxycodone, and also the money laundering count. Ms. Kincaid raised three issues on her appeal, three primary issues, the first being the insufficiency of the indictment. She filed a motion to dismiss in which all of the co-defendants joined, alleging that because a doctor was not charged in this conspiracy, the indictment was fatally flawed and subject to dismissal. She also is appealing the sufficiency of the evidence and raised two issues regarding sentencing, both a significant sentencing disparity that was created by her being sentenced to life in this case, as opposed to numerous similarly situated defendants, both locally in the eastern district of Tennessee and on a national scale. And she's also challenging the calculation of the drug quantity in this case. As Mr. Brown indicated, this case arose out of the operation of Breakthrough Pain Therapy Center, which was a pain clinic located in Maryville, Tennessee, that Ms. Kincaid opened with her husband in July of 2009, and it was shut down on December 14th of 2010 when the government executed a search warrant and these defendants were indicted. As is obvious, Sandra Kincaid's adult children, Wendy Henry and Dustin Morgan, were also charged and convicted in this conspiracy. They were employed at various times at the clinic, but the most significant thing in this case is that who was not charged and convicted in this conspiracy were the approximately 12 medical professionals that were employed by the clinic. Specifically, there was a supervising physician on staff the entire time that the clinic was in operation, Dr. Deborah Thomas. Were they charged later on? They were charged after these defendants were sentenced in a separate conspiracy, and that's still pending, Your Honor. Well, I don't understand what's the problem. Why can't the government decide to charge the medical people in one indictment and the people who are the lay people running the clinic in another? The problem is that the entire object of the conspiracy would be impossible for Ms. Kincaid to pull off without a doctor being involved, and when you look at all of the proof at trial, and it's interesting when you look at the superseding indictment, and how careful the government was not to even reference that there were doctors at this clinic, so that made the focus at trial be entirely on Ms. Kincaid, and we were lacking testimony or any way to get evidence into the record about the level of involvement of the doctors, and it made the whole proceeding fundamentally unfair as to Ms. Kincaid because we simply couldn't say, I mean, we could argue that there was a doctor there that was examining patients and issuing prescriptions, and the testimony did support that. Most of the patients, well, virtually all of the patients testified that they did see a doctor at some point when they visited the clinic. So you could ask those patients then, did the doctor prescribe these pills, and the patient would say yes. Isn't that helpful to your side? It should be. Well, doesn't the government simply respond to the argument that your client wasn't charged with dispensing? Doesn't that really dispose of the entire argument on this issue? Well, in your honor, I know you wrote the opinion in Johnson in the United States v. Johnson case in the 1970s, holding that a layperson can be charged with conspiracy. That wasn't a conspiracy. That was just distribution of narcotics. However, again, when you look at the superseding indictment, it talks about dispensing. It starts with listing the various schedules of controlled substances and how those can lawfully be prescribed, and then it goes into alleging that Sandra Kincaid did a number of things that really should only be within the purview of a licensed medical professional, such as examining patients, deciding the amount. Doesn't the count talk about distribution, not dispensing? The specific, it starts out, and you're correct, your honor, that it is a distribution charge. However, when you look at everything in the manner and means, it's clearly describing a dispensing situation. And again, it makes it difficult to process as a defendant when there's no doctor charge. And this case is somewhat of an anomaly in that regard. I mean, I've pulled numerous cases from, you know, in researching this brief extensively. I haven't found a single other case where the doctors were not charged in the conspiracy. And that makes this case very unique. I guess I'm struggling to see what legal principle you think is violated by the government's decision to charge distribution rather than dispensing. I mean, did you not have notice of the basic nature of their charge or something? What exactly is the problem? Yes, it is that we didn't have notice of the exact nature of the charge. Well, you knew it was about this breakthrough thing, and there is a fair amount of detail about what was going on and why it was illegal. There is detail. But again, without the doctors being charged and no evidence as to their level of involvement, it's, again, difficult to defend. I mean, when you look at the testimony, the testimony specifically as to Ms. Kincaid's involvement in issuing prescriptions or signing prescriptions was very limited. I think two witnesses testified that they saw her sign a script at some point. And on cross-examination, Tanya Overholt, who was a confidential informant for the government, testified that she was approximately 10 to 20 feet away when she allegedly saw Sandra Kincaid writing on this prescription. And you can look at the 52 patient files that were entered into evidence and at all of those prescriptions, and they're all signed by Dr. Thomas or Dr. Joyner or one of the numerous nurse practitioners or physician's assistants. There's no specific evidence that Sandra Kincaid forged any of those prescriptions. And again, the testimony was limited about her handing prescriptions to patients. There is some testimony that patients in the waiting room would be there, and Ms. Kincaid would walk out and ask if they needed to see a doctor, and if they said that they didn't, she would disappear into her office and return with a prescription. But she wasn't convicted of forging prescriptions, right? So she was convicted of conspiracy to distribute oxycodone, et cetera, right? That's correct, Your Honor, but the distribution was via the means, the issuance of unlawful prescriptions through Breakthrough Pain Therapy Center, and the allegations in the manner and means section say that she was examining patients and issuing prescriptions. And again, the testimony on that point was very limited. So to move on to sentencing where she suddenly – and there was no quantity alleged in the indictment either. So going into trial, Ms. Kincaid had no idea specifically how much quantity of narcotics she was being held responsible for. And then we have the 52 patient files that the government's expert testified about, and I think there was testimony from one patient that she put two pills in her mouth at one point, and there was some quantity of drugs found at her house. But all of those pills that there was specific testimony about was minuscule compared to this extrapolation method that was employed to determine her sentence. And again, I think the government looked at every – I mean, they did. They looked at every single pill that resulted from every single prescription that was ever issued by the clinic, whether that was by a doctor, by a nurse practitioner, by Ms. Kincaid in these very limited circumstances that she did that. And I just simply – there wasn't proof at trial or by a preponderance of evidence at sentencing to support that amount of holding her responsible for that amount of drugs. Did the jury find a quantity amount? They did not, Your Honor, no specific quantity. At one point, actually, I think the jurors came back with a question whether a prescription equals a pill. They were uncertain on that point. The main problem with the whole case is the veneer of legitimacy around this business was so thin that just – you could walk in there off the street as a non-law enforcement officer, and in five minutes you'd know what was going on. Almost all of their clients were disasters waiting to happen when they left the place. And, Your Honor, the few that testified at trial, admittedly, I mean, there were maybe, what, I don't know the exact number of patients that testified at trial, but they represent a very small sampling of the clinic's overall patients. I mean, the clinic had approximately 1,000 patients, and the testimony at trial was limited to 5% of those. And even those people testified that they had a history of either being injured, they had severe pain, they had visited numerous clinics before this clinic and had been on a similar regimen of medication. So how Ms. Kincaid, as a layperson, was supposed to determine whether, you know, these were people in legitimate pain that needed treatment by a physician, I mean, that's simply not within the purview of her authority as a layperson operator of a clinic. She has a GED, and that would be in the purview of the doctors. And the doctors had access to the patient's files. They were reviewing the records. They were charting their treatment of the patients. I know the testimony was that sometimes there weren't examinations, but sometimes there were, and this was ongoing chronic pain management. It wasn't, I mean, even the expert Dr. Miller testified that he doesn't spend nearly as much time with the patient on a subsequent visit as he does on an initial visit. It's just the nature of pain management. Sorry, my time is up. Thank you very much for hearing argument today. Your Honors, may it please the Court. My name is Gerald Gulley of the Knoxville, Tennessee Bar. I am here on behalf of the co-defendant Wendy Henry, who is the sister of Dustin Morgan and the daughter of Sandra Kincaid. Ms. Henry was charged and convicted on account of conspiracy named in the superseding indictment, and the issues that I raised on her behalf have been briefly touched upon in part by, through the very able efforts of my co-counsel. There are just a couple of things I wanted to emphasize, and again, going back to the issue about the computation of the amount of pills, certainly with respect to Ms. Henry, one, I guess we contend that the basic methodology is flawed for several reasons. Agent Loudon took, I guess, the entire number of patient visits from the opening of Breakthrough Pain Clinic up until the time that it was closed in late 2010, came up with 14,131 patient visits based on the sign-in sheets. Now, again, and she testified that she used information from the 52 files that were allowed by the trial court to be considered, the other files being the court said that could not be used because of lack of probable cause for those, but she used the 14,131 patient visits over the entire time frame of this conspiracy for which the defendants were convicted. And again, with the methodology, it's flawed because it assumes that every single patient visit, every single patient was there for an improper purpose. Couldn't you say it was a conservative estimate because it just, my recollection, correct me if I'm wrong, was that it assumed that there were 120 pills per prescription, whereas some of them were more? And some of them were less. I think Agent Loudon testified at the sentencing hearings that it was basically, she got the numbers based upon the amount obtained by an average customer for the 28-day prescription period. And then you've got the problem in terms of sentencing. Is the amount, if you cut the amount in half, would the sentence be the same? There's a lot. So what's the answer to that? If you cut the amount in half, would the sentence be still within, is it still within the same guideline range? Well, and I think this was raised in my sentencing memorandum and addressed by the court, that even if you look at the time frame based upon the time that Ms. Henry was actually involved in the conspiracy, from 2009 up until April or late 2009 up until April or May of 2010, the trial court did come to that conclusion. But it's still improper because it's still based upon the flawed methodology, based upon the total number of visits over that period of time with the average customer, and you just can't do that because that involves an improper assumption that every single visit by every single patient involves something illegal. The answer to Judge Moore's question is yes. Yes, I'm sorry, and I thought I made that clear, but I'm sorry. Yes, in a word, yes. Just for the record, isn't it true? It just seems to be a striking fact, and just correct me if I'm wrong in my understanding, that every single one of these 106 files that the agent looked at, the prescription was the same, 30 milligrams roxicodone or whatever that was. I think there may have been some variation between the roxicodones and the oxycodones and so forth. Every one was 30 and one of them? Typically, yes. I mean, that's a remarkable sort of convergence, isn't it? I mean, in terms of, well, is every one of these invalid? Well, they're doing something the same for all of them. That doesn't necessarily mean that each patient was there for an improper purpose. No, it doesn't. It doesn't. But, you know, I mean, you have a tough standard here in terms of inferences. Believe me, I'm aware of that. But, I mean, in the case law also, you know, the Sandridge, the case stated, you know, there has to be a minimum level of reliability for determination of the drug quantities. Respectfully, I don't think that is here the way that the government approached it. You know, if you wanted to take the testimony of the witnesses at trial for which, you know, the finder of fact in the trial court at sentencing could infer that, indeed, there was an improper purpose, then you're cutting the amounts way down. You know, and certainly if you look at it with respect to Ms. Henry for that six months or so time period for which she, you know, was, I guess, supposedly involved in the conspiracy, then it's, I think the drug quantities are going to be drastically reduced and it's not just a question of, you know, instead of, you know, 11 times the amount needed to get to the level 38, it's going to be six times the amount. You know, we're going to be looking at something significantly less. So, I think that it is important, certainly with respect to her. Your Honor, I see that my time, if I may. Thank you, Your Honor. Do you want to use your rebuttal time now? No, and I think the rebuttal time was sort of one of us was going to be up here and not all three of us. We will look forward to your, one of your, whatever. Yes. Whatever you want to do. We'll draw straws. Thank you, Your Honor. Ms. Coleman. Good morning, Your Honors. May it please the Court, my name is Jennifer Coleman. I am the representative of the United States of America, and at my table is my trial partner from this case. Actually sitting there is the agent who came up with the actual computations for the narcotics. Basically, I'd like to just kind of clarify a couple of things first based on what the defense said. I'm not sure where we're coming up with 106 files. We had 54 that we were actually narrowed down by a magistrate to look at, and that's what we worked with for this trial since then, which is not on the record, but we've been able to find the rest of the files. As to . . . I thought after trial you found another 54 boxes from which the agent pulled one file each and did this. I stand corrected, and that is . . . I had the same number that defense counsel . . . That's actually true. I'm sorry, I did forget that. And that is how she came up with the compilations. She did pull from those files. I stand corrected. Now, as far as the drug quantities, we did take a conservative approach, and let me just point out what I think is probably the strongest part of our argument when this came up. As far as where we came up with the 30 roxicodones times the specific amount of pills, you will see from the record that there were a large amount of pharmacists that actually started calling in, like 20-some pharmacists in that area, and it's a very small area. And basically their concern was that there was a cocktail of these drugs being given over and over and over again that they were seeing by these, and we called them customers, that were coming in droves three and four at a time to fill these prescriptions from breakthrough. Did any of the pharmacists ever get indicted? No. Actually, all of the pharmacists ended up stopping selling. After a while. After a while, yes. Yes, which is another interesting part of this because some of the pharmacies were the mom and pops, and basically actually one of them that testified told us that he decided he, in fact, didn't. He started filling their prescriptions later because he didn't feel comfortable, but then they came and talked to him, and he felt like they were Christian-based and that they were okay and then realized he had gotten taken for a ride. But he told us that basically in order to stay in business with the larger pharmacies, that they felt like they had to fill those. So there's definitely issues there. Also, just to point out that as far as conservative. In terms of the quantity, opponents are arguing that some of these prescriptions were legitimate, and so even though you call it a conservative estimate, you can't say that every single one of the 14,000 patient or customer visits involved an illegal prescription. Your Honor, with all due respect, there was nothing in the record to indicate that there was any legitimate even exams or giving of these patient records based on what we had, based on our doctor who testified. And quite frankly, Your Honor, not to be glib, but even a blind hog finds a nut every once in a while. So even if, say, half of those were filled for a legitimate reason, you're still at a level 38. So the other thing that is important to note, just to understand how many drugs that were going through there, was if you just specifically went with our 52 files that we had in the beginning that our expert looked at, you're at a level 36. So I think that gives you a huge indication as to what was happening. Just those files directly, no extrapolation? Correct. What about, as you said, for the first 52? Yes. Have you done that same computation for the 106 or maybe not? We've done quite a lot since we've indicted the doctors, and we're looking at different ways to complete. So this would have to be evidence that would be in this case? That is correct. That is correct. So in the record, the 54 alone puts you at a level 36. That's without seeing the prescriptions that we do know were out there and the people that signed in. Your opponent said something about of the 52 or the 54, 11 were dismissed as patients. Is that correct? That probably would be right. So that would suggest that the pain clinic realized that these people were coming for illicit drugs and threw them out as patients. Or it could also suggest that what we have seen were that they were troublemakers, that they could get them either they might have been doctor shopping or doing something that would cause law enforcement to zero in on them, and so they would dismiss them. So this was argued or presented to the district court in the course of sentencing? Or is this sort of an after-the-fact explanation? I believe, Your Honor, and, again, this was a while ago, but I believe that that theory was put forth in trial. Because it was raised in trial as to the dismissal of this patient. You're talking about the trial at the guilt phase as opposed to the sentencing phase? That is correct. Because I want to say, actually, a couple of the witnesses that we put on had been dismissed, and they gave the reasons for why they were dismissed. So, yes, that was on the record. Would you talk a little bit about the gun charge? I know Morgan got a below-guideline sentence, but how much of that sentence was driven by the gun charge? I believe 60 months was driven by the gun charge. The mandatory? The mandatory. And was there another tie-in to him besides being found in his desk? Yes, actually, Your Honor. With Dustin, to me, it was more overall looking at the entire participation. Basically, what you have is, again, a situation where just taking the gun. And we started off by saying that we believe that he was a security guard. This came from testimony of our agent, actually, based on what witnesses had seen, that he was carrying a gun and walking around. It's not that he had security on his back or something of that nature, but then he soon, when he went to full-time, then he became the collector of the money, as we know, the cash that had to be paid up front. Was the gun possessed illegally? No. If he was a security guard, that would legitimize the possession, wouldn't it? Straight out, yes. But when you look at all the circumstances, because he was using it to protect the drug conspiracy, then no. And what I'm saying is that when you look at things, say, for instance, why is a person who's sitting at the front desk of a doctor's office carrying a gun having a weapon to do that? I think any rational juror could say that's a little odd. But our whole theory is that this case went outside the four walls of the breakthrough area. As you recall, there was testimony that Sandra Kincaid was, in fact, dealing outside of her house, going to parking lots and doing it. You have Mr. Dustin, who had the gun at his home, which was a different gun. And what's interesting about those facts is the fact that his wife also worked at Breakthrough. She was also a customer there. There was evidence that she and Wendy Henry and Sandra were mixing and buying and giving pills to each other based on the type of pills that they liked. And what was also interesting was so there was a prescription for Lortab, which was Schedule III, which wasn't the drug of choice, from November, that was there that had never been filled, along with empty bottles, wherein there were multiple pharmacies filling them. The interesting part of that is also there were the contracts, the pharmacy contracts that they used. And this was supposed to show legitimacy, that they were concerned this would keep you from doctor shopping to not go to the different pharmacies. Well, what you have is one of these sitting there filled out and signed by Dustin as an employee for his wife, and then other ones that were, in fact, empty, which indicates his being part and knowingly going through this conspiracy to continually help to distribute illegal drugs specifically to his wife. I'm a little bit confused about the Dustin Morgan and the firearm. Okay. So there's a firearm in his desk at the Breakthrough Pain Clinic. Correct. And the Count III charges him with knowingly possessing a firearm in furtherance of a drug trafficking crime. Yes. Was Count III relating solely to that gun, a firearm in that drawer? Yes, that is correct. Okay. So why did you introduce evidence that he had a firearm in his house? Because, as I had mentioned earlier, under 401, it's relevant to show that this conspiracy, his actual knowledge, and that the conspiracy was outside of these four walls, that it continued not just in the building. I don't understand how it's explained the relevance to that point. I don't follow. As far as the— Having a gun at your house or a firearm at your house, there are many people who have firearms for target practice or shooting rabbits or whatever. Sure. And just the gun itself, probably no relevance, especially in Tennessee, not being from Tennessee. But what we found to be relevant is the fact that it's an additional weapon with the additional prescription, the contracts, and the cash all together there, which also goes along with, as far as relevance to show, as we did with the other search warrants in those homes, the relevance we also took those guns that Randy Kincaid had, the multiple guns. I mean, that house was filled with all sorts of pills everywhere that you could find them, cutting instruments, empty bottles from also Heather Morgan. What material fact, though, is all this tending to show? It's going to show that he was using the gun that we charged him with in furtherance of a drug conspiracy. I just don't understand it. I mean, how does the gun at home go to show that he was using the gun at work in a certain way? Again, Your Honor, I feel like I keep—I know I'm not answering your question. I just don't understand the relevance. Well, because when you—in a drug conspiracy, I think everyone knows that a lot of people to protect that conspiracy because the drugs cost money, there's cash around, there's pills.  All that. And so what we're saying is that they believed that they—and you saw in the transcript that they justified carrying around the guns because they had been robbed earlier. They believed that wherever these drugs were, they needed to be armed. Correct. That's what I'm—it took me a long time to actually use that, but that's what we were trying to show. Okay. And so that's why. I also wanted to just say as far as the drug quantities as far as being conservative, we would like to point out that the district court actually on Dustin, we only went with the time that we could prove that he was there full time. We did not go with the full amount. Also, as far as Mr. Gulley's defendant, Wendy Henry, it was pointed out by the court that even if you went with half of the amount, which is way less than when she actually left, and we say she stayed in the conspiracy because she went and opened her own pill mill, but it would still be a level 38. Why does Sandra have a life sentence? She deserves it. I mean, this case is very important. This woman who had absolutely no medical experience opened up a pill mill that ran wide open for 17 months, a situation, a new type of drug case that DEA had never seen, and yet they were able to shut this down within that amount of time because it was so obvious. And what's more disturbing is that this woman who obviously had a drug addiction herself used other people's drug addictions, and it affected so many people, not just the people that had the addictions, but their families, the communities. She went outside of the four walls so that she continued her drug sales from her own home. The number, the sheer number alone, is why she should be there. And she claims that there's a disparity. You started out saying that there wasn't a disparity in terms of national disparity, and I think our case law says that we look at a national issue. So typically people who have done this type of pill mill get a life sentence? Your Honor, I think a lot of times they wisely choose to plead. I think it's hard to gauge. I know what you're probably speaking of is the diversion site that comes out with their different cases, but the problem is with those it's hard for us to look at to see, to determine the amount of drugs, what the situation was, how many counts, those kind of things. But from my looking at it, I know in the Johnson case the person got 30 years, which is essentially life. I think it just depends on the situation and how it's dealt with. I guess the person who's not in front of us but whose appeal we will be deciding, Randy got 830 months, which is not life, but it is in terms of years, 69 years, which is a long time for anybody except for a 20-year-old. It is a long time. It's a serious crime. That's all I can say about it. That's where the guideline range is. That's obviously where Congress feels that it's important on these type of drugs. And even now, if you're looking at the new guidelines, they're still 38, no matter how you slice it. Yeah, it was a short amount of time that they did it, but they did a huge amount of damage in eastern Tennessee. Do you wish to address the sufficiency of the evidence issue that your opponents have raised, or do you want to rely on your brief? I'll rely on my brief, Your Honor. I feel like we have set it out. And if there are no other questions. I have just a curiosity. Yes, sir. I have a question. Would I be right in assuming, if you know, that some of these phony prescriptions that were written were also paid for by Medicare, Medicaid, and various insurance companies? Good question. They did not take insurance. They did not want to deal with it. I will speculate and say I think maybe Heather Morgan and Wendy Henry, they had TennCare. They might have been doing that. Well, when you take the prescription to the pharmacy, that's who gets paid, isn't it? Oh, yes. I'm sorry. Well, it's outside the record, but it sort of bears in general on the harm that's done by this kind of operation on the thing. I imagine the loss, which taxpayers are paying for, is huge in these kinds of things. I will say, Your Honor, that in discussing this with the pharmacists, they were basically the thing that was interesting to them was that most of these people were coming in and paying cash for it, which is no small affair. And that was what was of interest to them is how these people were able to be coming up with literally thousands of dollars each month in cash. And I'm told, actually, that Wendy Henry did use the TennCare. If there's nothing else, I will rely on my briefs. Thank you very much. Your Honor, if it pleases the Court, I think Ms. Moore would like to have two minutes, and I'll just take three here real quickly. I'll sort of wrap things up. I think Your Honor has touched on an important issue with respect to the gun, the gun and furtherance of a drug trafficking crime. And particularly, I think we've touched on something very important about the gun in his home, and that is the fact that we've asserted all along, all through the process, that that just simply isn't relevant, that the gun in his home, and the statement is, and I realize that the government agreed with Your Honor's statement that we're Well, I was trying to understand their argument. I'm not making it No, and I didn't mean to misquote you. Oh, I know. It's not at all. I just wanted to make clear. And if their argument is, wherever the drugs are, they need to be armed, well, there may be drugs at Mr. Morgan's residence, but those were drugs that were specifically prescribed for his wife, Heather Morgan, for her personal use. And there's no proof in the record anywhere that Mr. Morgan was distributing drugs out of his home such that there would need to be a firearm there. I guess, you know, I mean, just as it's perhaps difficult to understand the relevance of the gun at home, it also seems difficult to understand why it would be terribly prejudicial. I mean, who's going to be offended or think that somebody is malevolent or something? What juror is really going to Well, I think it's prejudicial only in the respect that I think the theory here has been that the gun was found in his desk at Breakthrough to further the drug trafficking crime. And because he has a gun at his house, he looks a little bit like just a gun-toting drug dealer, basically. And we're asking, he had a right to be charged and tried with what was found at Breakthrough, not with what was found at his house, not with what was found in a safe deposit box. But, by the way, the $23,000 worth of cash, the government can never establish the source of that cash. In fact, they've even conceded in their brief that it was from Heather Morgan's earnings at Breakthrough Pain Therapy Center. So none of those things had any relevance on anything that happened at Breakthrough Pain Therapy Center. And I know I'm sort of repeating the same thing, but to kind of wrap it up here, because this is my last opportunity to talk to you, is that when you look at this overall case and anything they said that my client did was for two reasons. Because there was a doctor there prescribing these medications and writing these scripts, and because there were two owners of the clinic who, all be them family members, had set up this clinic, were in charge of its operational policies, were in charge of everything at that clinic, and were reaping the profits from it. My client got nothing but a weekly paycheck. It's guilt by association. That's why we're asking this court to reverse it and ask the district court to enter judgment of acquittal. And I thank you very much for your time today. Thank you. Just briefly, I would like to address the sentencing disparity issue on a nationwide scale. It was brought up during the government's response, and I detailed numerous cases in our briefs, and it is difficult looking at these cases because the pre-sentence reports aren't part of the public record, so it's hard to determine exactly what played into these computations in a lot of these cases. But the first thing that jumps out is clearly nobody else is getting life sentences for these kinds of crimes, specifically doctors. It seems consistent in every case I've looked at that for whatever reason the doctors end up getting less time than the layperson owner-operators in the majority of cases, and that just struck me as odd, and I don't really understand why that happens. There could be criminal history points that cause that, that the doctors have been not amassing criminal records and the other people have. That could be. I'm just making that up, but there are reasons that could exist. That's true, Your Honor. In this case, Sandra Kincaid had a criminal history score of zero, and Tammy Guzman, the case that I've asked the court to take notice of the record, the parallel case where the Guzman Clinic was in operation for 11 months longer than Breakthrough in the same county, Sandra had worked with Tamara Guzman before, and she absconded during trial, younger woman, she got 20 years. She was dispensing pills on the premises. There was clear evidence that there were pre-signed prescriptions she was issuing. She had more patients than Breakthrough. I believe she had 2,000 patients in the record and Breakthrough had 1,000. I mean, everything looks practically identical. The quantity was less than half in this case. Because, Your Honor, Tamara Guzman did not keep records for a period of 10 months that she was in operation. Well, we're not going to argue the Guzman case, but that is sort of the fact we have from the opinion. Sure, Your Honor, and that's what the court looked at, but there was a reason for that. But the United States v. Bacone was a Fourth Circuit case, and I just wanted to draw the court's attention to that because that's another case very similar where there was a firearm involved and the layperson-owner-operator got 36 months. And I apologize, I'm out of time, but thank you again for your consideration today. Thank you all for your argument, and I see that all three of you defense attorneys were appointed pursuant to the Criminal Justice Act, and we want to thank you for your representation of your client and your service to the cause of justice. Thank you all for your argument. The cases will be submitted.